IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| **UNITED STATES OF AMERICA,** | \* |
| v. | \* Criminal No. SAG-08-0165 |
| **DAVON PERRY,** | \* |
| **Defendant.** | \* |

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

## MEMORANDUM OPINION

Davon Perry, who is presently in Bureau of Prisons ("BOP") custody at a high-security institution, USP Terra Haute, has filed a Motion for Compassionate Release ("the Motion"), ECF 101, along with an exhibit, ECF 101-1, and two supplemental filings. ECF 102, 110. This Court has also received correspondence from several of his friends and family members. ECF 106, 107, 111, 112, 116. The Government filed an opposition to the Motion, ECF 114, and no reply has been received. For the reasons that follow, Perry's Motion is DENIED.

### I.  Factual and Procedural Background

On July 22, 2008, a jury convicted Perry of carjacking and possession and brandishing of a firearm in connection with a crime of violence. The Government's summary of the evidence, as cited in the Presentence Investigation Report, is as follows:

> On February 4, 2008, at approximately 12:50 a.m., Baltimore City 911 operators received a call from Latia Skeens. Ms. Skeens stated that she was located at Arydale and Forest Park Road and that she had been kidnaped and carjacked by her ex-boyfriend, Davon Perry. She also indicated that she was forced to drive to Arydale Avenue and, when she escaped, she struck Perry with her vehicle.
>
> Ms. Skeens testified that she and Perry had been in a relationship beginning in December of 2006. The relationship became verbally and then physically abusive.

1

Ms. Skeens had taken out a protective order against Perry in August of 2007. However, Perry continued to abuse Ms. Skeens.

On February 3, 2008, Ms. Skeens was in phone contact with Perry. An argument began between the parties since Perry wanted to take Ms. Skeens to a Super Bowl party and Ms. Skeens did not want to go out with him. While at the party, certified cell phone records show that Perry called Ms. Skeens 52 times. After Ms. Skeens left the party, she met a friend, Angel Smith. While at Ms. Smith's home, Ms. Skeens checked her voice mail messages and found that Perry had left several angry messages for her. Ms. Skeens made repeated attempts to contact Perry in order to ascertain his location. Ms. Skeens left her friend's house at 333 Parish Street, Baltimore Maryland, in order to pick up her sister. Ms. Skeens pulled off near the corner of Parish and McHenry Streets and continued to phone her sister and Perry. While she was on the phone, a Buick Rivera struck her Toyota Camry in the bumper. PODSS footage from the area showed an individual, identified by Ms. Skeens as Perry, approaching her vehicle. Perry was carrying a semi-automatic handgun, which he began to bang on the passenger side window. Perry then demanded that Ms. Skeens open the doors and allow him to enter. After several minutes, Ms. Skeens unlocked the car door and allowed Perry inside. Perry then began striking Ms. Skeens in the face with his fist. Perry told Ms. Skeens that he was going to kill her by taking her to a family owned recording studio and shooting her in a sound proof booth. Ms. Skeens attempted to reason with Perry. However, he indicated that she had disrespected him by not returning his calls and he was going to kill her. Ms. Skeens was instructed to drive her car to 3306 Arydale Avenues (the location of the studio). At one point in the drive, Ms. Skeens asked to pull the car over to try and talk with Perry; however, he told her to continue to drive. Ms. Skeens then began to run red lights in an attempt to get the attention of a police officer. When Perry realized what Ms. Skeens was doing, he struck her in the face with the semi-automatic gun and pulled her right thumb back, causing hand injury. Perry told Ms. Skeens that if she continued to run red lights he would break her fingers.

Upon arrival in the 3300 block of Arydale Avenue, Ms. Skeens exited and stood by her car while Perry unlocked the gate to the recording studio. While he was doing this, Ms. Skeens ran back to her car and locked the car doors. Perry then lifted his left arm and pointed the gun at Ms. Skeens. Upon seeing the gun being lifted, Ms. Skeens ducked down and hit the gas petal of her vehicle and attempted to make a left turn. Ms. Skeens instead slammed her vehicle into the corner of a building. As she backed up, she noticed Perry lying on the sidewalk. At this time, Ms. Skeens realized she had struck Perry with her vehicle and had broken his leg.

While Perry was lying on the sidewalk, two men, one later identified as Ricky Carter, approached the scene. Believing at first they were there to assist her, she asked them to call 911. She soon saw Carter speaking with Perry and Perry handing the semi-automatic handgun to Carter. Perry then instructed Carter to shoot Ms. Skeens. At this time, Ms. Skeens pulled her vehicle forward and called 911. While

she was doing this, she observed Carter run from the scene with the gun. He subsequently returned a few minutes later without the gun.

Officers Lonnie White and Rosemary Robinson testified that upon their arrival at the scene they both spoke with Ms. Skeens regarding what had happened. After speaking with officers she was transported to a local hospital for treatment of her injuries. Officer Robinson took photographs of Ms. Skeens while at the scene.

Officer Howard Flynn testified that he had received a call to Ms. Skeens home on March 21, 2008. While at the residence he overheard a telephone conversation, in which the caller told Ms. Skeens not to go to court and threatened to file false charges against her. Ms. Skeens indicated to Officer Flynn that it was Davon Perry on the phone. A subsequent telephone misuse report was generated listing Perry as the person who had phoned.

Detective Ray Bennett testified that he was the primary investigator in the case. He spoke with Ms. Skeens on the night of the incident and on other occasions. He responded to Parish and McHenry Streets and located Perry's Buick parked where Ms. Skeens indicated it would be. He also ordered PODSS footage to be recovered. He obtained a search warrant for 3306 Arydale Avenue in which he located a room that appeared to be a sound proof room. Also, located at the address was a debit card in the name of Davon Perry.

ECF 114-1.

On December 2, 2008, United States District Judge J. Frederick Motz determined that Perry was a career offender, with a guidelines range of 360 months to life. ECF 55 at 3-4; Exhibit 1, Presentence Report, at ¶¶ 34, 38.  Judge Motz imposed a thirty-year sentence, specifically 180 months per count, to run consecutively.  ECF 44.  Perry, who has been incarcerated since February 4, 2008 (or just under thirteen years) now seeks to have his sentence reduced, requesting release to home confinement in light of the COVID-19 pandemic.

## II.     Legal Standards

As part of the First Step Act, enacted in December, 2018, Congress expanded 18 U.S.C.

3

§ 3582(c), permitting courts to reduce an existing term of imprisonment where "extraordinary and compelling reasons warrant such a reduction." *See* 18 U.S.C. § 3582(c)(1)(A)(i) (2018); Pub. L. No. 115-391, tit. VI, § 603(b), 132 Stat. 5194, 5239-41 (2018). While previously, any motion for compassionate release had to be initiated by the Bureau of Prisons ("BOP"), the First Step Act granted defendants the ability to move the Court for a reduction in their sentence for "extraordinary and compelling reasons." § 603(b)(1). Before a defendant's motion can be filed with the Court, one of two conditions must be satisfied: (1) the defendant must have exhausted all administrative remedies to appeal the BOP's failure to bring a motion on his behalf, or (2) thirty days must have lapsed "from the receipt of such a request by the warden of the defendant's facility," whichever is earlier. *Id.* Once a motion for compassionate release is properly filed, the Court follows a three-step inquiry: (1) determining whether "extraordinary and compelling reasons" render the inmate eligible for compassionate release; (2) considering whether the factors set forth in 18 U.S.C. § 3553(a) weigh in favor of a sentence reduction; and (3) ensuring that the reduction is "consistent with applicable policy statements issued by the Sentencing Commission." 18 U.S.C. § 3582(c)(1)(A)(i).

**III. Analysis**

The Government does not contest that Perry adequately exhausted his administrative remedies and is therefore entitled to file this Motion. ECF 114 at 3. Further, the Government concedes that, in light of Perry's obesity and the presence of COVID-19 infections at USP Terra Haute, he has demonstrated an "extraordinary and compelling reason[ ]" rendering him eligible for consideration for compassionate release. *Id.* at 5. While this Court accepts those findings, Perry remains ineligible for release because the 18 U.S.C. § 3553(a) factors militate against a sentencing reduction.

4

This Court acknowledges the increased danger of COVID-19 infection to those in incarcerative settings, particularly facilities that have been affected by the virus, and takes seriously its responsibility to assess whether compassionate release is justified, especially for individuals presenting with some medical vulnerability. However, in order to grant compassionate release, this Court must be persuaded that a sentencing reduction is warranted after considering the factors in 18 U.S.C. § 3553(a). Those factors are:

(A) To reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
(B) To afford adequate deterrence to criminal conduct;
(C) To protect the public from further crimes of the defendant; and
(D) To provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

18 U.S.C. § 3553(a)(2)(A)-(D).

Those factors weigh heavily against the requested reduction. Perry's criminal conduct, as described above, was extraordinarily violent and serious, suggesting that he presents an ongoing danger to the public. Perry qualified as a career offender, in part because of a prior felony conviction for armed robbery, and the instant offenses were committed while Perry was under probation supervision to another court. The seriousness of the offenses and of Perry's criminal record was reflected in the 360 months-to-life guideline range applicable at sentencing. Perry received a sentence at the lowest end of that guideline range – 360 months. To reduce that sentence to less than thirteen years would neither reflect the seriousness of his offenses nor afford adequate deterrence to Perry or to others who might consider this type of violent behavior. Moreover, the fact that he committed the offenses while under court supervision does not give this Court confidence that probation supervision could adequately protect the public from future crimes.

This Court recognizes Perry's participation in various educational pursuits while incarcerated and is cognizant of the plans he has articulated for his time after release and the

5

extensive support he has from his family and friends. Nevertheless, application of the § 3553(a) factors simply does not permit a reduction to time served for offenses of the nature of those he committed. The original sentence best provides just punishment for those offenses and will permit Perry to further avail himself of the educational and vocational training available in the Bureau of Prisons.

For the reasons set forth herein, Perry's Motion for Compassionate Release is DENIED. A separate Order will ISSUE.


DATED: December 14, 2020                     /s/
                                        Stephanie A. Gallagher
                                        United States District Judge